**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ALPHA S. DIALLO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 23-cv-13985 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| 50 EAST CHESTNUT CONDO | ) | |
| ASSOCIATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Alpha S. Diallo previously was employed at a condominium building managed by Defendants 50 East Chestnut Condominium Association (the "Association") and Chicagoland Community Management, Inc. ("Chicagoland"). In this lawsuit, he alleges that the Association and Chicagoland discriminated against him on the basis of his race and national origin and then retaliated against him for complaining about it. He also alleges that his manager, Defendant Rebecca Davis, the building's chief engineer, Defendant Mirsad Cerimovic, and his labor union, Defendant Service Employees International Union Local 1 (the "Union"), were involved in the discrimination. In his First Amended Complaint ("FAC") (Dkt. No. 136), Diallo asserts numerous claims related to Defendants' discriminatory conduct, including claims for violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. 2000e *et seq.*, and for various common-law torts. Defendants have moved to dismiss the FAC for failure to state a claim. For the reasons that follow, the Union's motion to dismiss (Dkt. No. 147) is granted in its entirety, and the motion to dismiss filed by Defendants Chicagoland, the Association, Davis, and Cerimovic (Dkt. No. 149) is granted in part and denied in part.

**BACKGROUND**

For purposes of Defendants' motions to dismiss, the Court accepts all well-pleaded factual allegations in the FAC as true and draws all reasonable inferences from those facts in Diallo's favor as the non-moving party. *See Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). Because Diallo is a *pro se* plaintiff, the Court construes his pleadings liberally. *Hudson v. McHugh*, 148 F.3d 859, 864 (7th Cir. 1998). "The essence of liberal construction is to give a pro se plaintiff a break when, although he stumbles on a technicality, his pleading is otherwise understandable." *Id.*

The FAC spans 116 pages with 402 paragraphs and 14 separate causes of action. For the most part, its length appears to result from Diallo's effort to describe the events underlying this suit in excruciating detail. Of course, that is not necessary to satisfy federal notice-pleading requirements. For the most part, the Court finds Diallo's claims more straightforward than the length and complexity of his complaint would suggest. The Court summarizes the main allegations as follows.

From June 2015 to April 2024, Diallo, a Black man of Guinean national origin, worked as a doorman at the 50 E Chestnut condominium building in Chicago, Illinois. (FAC ¶ 7.) His employers were the Association and Chicagoland—both entities responsible for managing the building.[1] (*Id.* ¶¶ 6–7, 34.) Throughout Diallo's employment at the building, he was allegedly subjected to discrimination on the basis of his race and national origin. For example, on January 4, 2021, Diallo asked the head doorman, Brian Smith, to "stop treating him differently," to which Smith responded, "[t]he Union rules don't apply in this building, and residents don't like people like you working here." (*Id.* ¶ 49.) From January 3, 2021 to March 5, 2021, Smith refused to

---

[1] Chicagoland began managing the property on April 1, 2021. (FAC ¶ 21.)

schedule Diallo for work shifts and instead "assigned additional shifts" to "a less senior employee who is Black and African American." (*Id.* ¶ 51.) During this period, Diallo also raised his concerns about discrimination to Cerimovic—the building's interim manager at the time— who took no action to resolve Diallo's complaint. (*Id.* ¶¶ 57–60.) Throughout the remainder of 2021, Diallo, Cerimovic, and Davis were involved in a series of disputes regarding Diallo's benefits and compensation and alleged violations of rules regarding doorman uniforms, tardiness, and parking. (*E.g.*, *id.* ¶¶ 96–121.)

Diallo filed formal grievances with the Union concerning the various disputes. (*E.g.*, *id.* ¶ 96.) For example, on January 14, 2022, Diallo submitted a grievance to the Union based on Davis's allegedly discriminatory denial of compensation and benefits. (*Id.* ¶ 122.) The Union investigated that grievance by speaking with Diallo and reviewing documents supporting his claims. (*Id.* ¶¶ 123–27.) A week later, the case worker assigned to Diallo's grievance "refused to file" it based on her finding that the "employer did nothing wrong." (*Id.* ¶ 131.) The director of the Union's grievance department then denied Diallo's appeal. (*Id.* ¶ 139.) Diallo continued attempting to appeal the determination from February to October 2022. (*Id.* ¶¶ 146–62.) Ultimately, in October 2022, the Union's international president took up Diallo's appeal and determined that "SEIU International would not conduct further review." (*Id.* ¶ 162.)

Meanwhile, Diallo reported numerous acts of "harassment" by his co-workers throughout 2022. (*Id.* ¶ 167.) In an incident on February 23, 2022, Smith "call[ed] [Diallo] derogatory names" and yelled "discriminatory remarks," like "go back to where you came from," before running "toward [Diallo] in a threatening manner." (*Id.* ¶ 164.) Davis and her supervisors reviewed footage of the incident but "no steps were taken to resolve the ongoing harassment."

(*Id.* ¶¶ 165–67.) Between July and September 2022, another coworker, identified as "Jenkins," "thr[ew] a seat cushion" at Diallo twice and "kick[ed] his lunchbox." (*Id.* ¶¶ 172–77.)

On March 10, 2023, Diallo filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") against the Union, the Association, and Chicagoland, "alleging discrimination, harassment, hostile work environment and retaliations." (*Id.* ¶ 189.) On April 26, 2023, the Association, Chicagoland, Davis, and Cerimovic "removed the thermostat controlling the lobby's temperature," monitored Diallo through the building's cameras, and "manipulated the heating and cooling system, exposing him to extreme cold." (*Id.* ¶ 196.) This conduct would persist for months despite Diallo's repeated complaints that the temperature fluctuations were causing him health issues. (*E.g.*, *id.* ¶¶ 197–219.) On July 10, 2023, Diallo filed another grievance with the Union related to this conduct. (*Id.* ¶ 224.) The Union investigated Diallo's complaint without initiating the formal grievance process. (*Id.*) It found that the alleged temperature manipulation had not in fact occurred based on evidence provided by the building. (*Id.* ¶ 228.) Diallo once again attempted to appeal the determination but was unsuccessful. (*Id.* ¶¶ 232–34.) On July 20, 26, and 27, 2023, the EEOC issued Right to Sue letters for Chicagoland, the Association, and the Union, respectively. (*Id.* ¶¶ 236–38.) In September 2023, Diallo continued experiencing health issues related to the building lobby's temperature, including "headaches, coughing, and chest pain." (*Id.* ¶¶ 239–42.)

Diallo initiated this case on September 21, 2023, when he filed his original complaint. (Dkt. No. 1.) In that complaint, he brought federal employment discrimination claims against the Association, Chicagoland, and the Union. He attributed the discrimination to "several individuals, including" Smith and Cerimovic, and alleged that the Union had colluded with Chicagoland "to retaliate against" him. (Complaint at 5, 8, Dkt. No. 1.) Although the Association

4

and Chicagoland answered the original complaint (Dkt. Nos. 7, 9), the Union moved to dismiss that complaint because Diallo had not alleged facts sufficient to implicate it in the allegedly discriminatory practices of the Association and Chicagoland. The Court granted the Union's motion to dismiss. (12/6/2024 Order, Dkt. No. 127.) The Court also granted Diallo leave to amend his complaint and urged him to "heed the direction in Federal Rule of Civil Procedure 8 and submit one document with 'a short and plain statement' of his claims." (*Id.* at 6.)

Diallo then filed the FAC on January 31, 2025. The FAC adds Davis and Cerimovic as defendants for the first time and asserts nearly a dozen new state-law causes of action. It also omits 42 U.S.C. § 1981 as a cause of action. Every claim in the FAC is asserted against all five Defendants, except for: (1) Count IV (breach of duty of fair representation), which is only asserted against the Union, and (2) Count XIV (defamation), which is only asserted against Davis and Cerimovic. (*See* 2/7/2025 Order, Dkt. No. 137.) The Association, Chicagoland, Cerimovic, and Davis filed a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 149.) The Union filed its own Rule 12(b)(6) motion as well. (Dkt. No. 147.) These motions are now before the Court.

## DISCUSSION

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard does not necessarily require a complaint to contain detailed factual allegations. *Twombly*, 550 U.S. at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

5

defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678).

## I. Title VII Claims

Diallo raises three types of Title VII claims. In Count I, he claims that Defendants discriminated against him on the basis of his race and national origin. In Count II, he claims that Defendants subjected him to a hostile work environment based on his race and national origin. And in Count III, he alleges that Defendants retaliated against him for complaining of the discrimination. Defendants argue that Diallo's Title VII claims must be dismissed for several reasons. The Court addresses each of those arguments below.

### A. Exhaustion

"Title VII does not authorize the filing of suit until the plaintiff has exhausted his administrative remedies," which includes timely filing a charge with the EEOC as well as an initial complaint. *Hill v. Potter*, 352 F.3d 1142, 1145 (7th Cir. 2003); *see also* 42 U.S.C. § 2000e-16(c). Specifically, a person who believes he has been discriminated against in violation of Title VII must file a charge with the EEOC within 300 days of the alleged unlawful employment practice to preserve his right to file a private lawsuit. *See* 42 U.S.C. § 2000e-5(e)(1); *Boston v. U.S. Steel Corp.*, 816 F.3d 455, 463 (7th Cir. 2016).

Failure to "timely file an administrative charge is an affirmative defense, and plaintiffs need not plead around affirmative defenses." *Garrick v. Moody Bible Institute*, 412 F. Supp. 3d 859, 867–68 (N.D. Ill. 2019) (quoting *Laouini v. CLM Freight Lines, Inc.*, 586 F.3d 473, 475 (7th Cir. 2009)). "Unless the complaint 'unambiguously establish[es] all the elements of the defense,' dismissal is inappropriate." *Id.* at 868 (quoting *Hyson USA, Inc. v. Hyson 2U, Ltd.*, 821 F.3d 935, 939 (7th Cir. 2016)) (declining to dismiss Title VII claim on exhaustion grounds

6

because the complaint was "silent on whether [the plaintiff] filed allegations with the state agency").

Diallo alleges that the discrimination began in June 2015 and that he filed EEOC charges against the Union, Association, and Chicagoland on March 10, 2023. (FAC ¶¶ 26, 325.) Given the nearly eight-year gap between the alleged beginning of the discrimination and Diallo's first alleged EEOC Charge, Defendants argue that most of Diallo's allegations cannot form the basis of a Title VII claim because they are outside of the statute's 300-day limitation window. In support of their argument, they submit copies of Diallo's EEOC charges. One of these charges, against Chicagoland, was filed on March 10, 2023. (*See* Charge of Discrimination, Dkt. No. 149-2.) The other two charges—against the Union and the Association—were filed on July 20 and July 21, 2023, respectively. (*See* Ex. A to the Union's Mot. to Dismiss, Dkt. No. 148 (the Union); Charge of Discrimination, Dkt. No. 149-1 (the Association).) Defendants also state that Diallo filed an EEOC charge related to his termination "on February 5, 2025." (Defs.' Mot. to Dismiss at 9 n.2, Dkt. No. 149.)

The Court requires a more fulsome record to determine precisely which portions of Diallo's discrimination claims, if any, are time-barred. As an initial matter, it is unclear how many charges Diallo submitted, when each charge was submitted, and against whom he submitted charges. The FAC is silent as to whether Diallo ever filed any other EEOC charges besides those on March 10, 2023. Meanwhile, the July 2023 and February 2025 EEOC charges raised by Defendants suggest that Diallo did not set forth allegations in the FAC or submit for consideration every EEOC charge he filed. And Diallo's response to Defendants' motions does not clarify these questions. With the benefit of discovery, the Court will be better positioned to

determine when Diallo filed EEOC charges and what allegations of discriminatory conduct those charges covered.

A more fulsome record is also necessary to evaluate Diallo's invocation of the continuing violation doctrine to suggest that some actions that might otherwise be time-barred can form the basis for his Title VII claims. That argument is tied up with factual issues regarding the nature, frequency, and pervasiveness of Defendants' actions. Based on the current record, the Court cannot conclude the continuing violation doctrine does not apply to Diallo's claims. *See County of Cook v. Bank of Am. Corp.*, 181 F. Supp. 3d 513, 521 (N.D. Ill. 2015) (rejecting the "[d]efendants' attempt to preclude application of the continuing violation doctrine at the pleading stage" because that issue "should be decided after evidentiary submission (and under a summary judgment analysis")).

In short, because of the ambiguities in the record, the Court declines to dismiss Diallo's Title VII claims based on exhaustion requirements at the pleadings stage. "The Court need not delve into this thicket today." *Garrick*, 412 F. Supp. 3d at 867.

### B. Sufficiency of Allegations

Title VII prohibits employers from taking adverse employment actions against their employees on the basis of a protected characteristic, such as race or national origin. *See* 42 U.S.C. § 2000e-2(a)(1). The Seventh Circuit has stressed that Title VII claims are held to a forgiving pleading standard because "[e]mployers are familiar with discrimination claims and know how to investigate them, so little information is required to put the employer on notice of these claims." *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 827 (7th Cir. 2014). "A complaint alleging [race] discrimination under Title VII 'need only aver that the employer instituted a (specified) adverse employment action against the plaintiff on the basis of her [race].'" *Id.*

8

(quoting *Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008)). "'I was turned down for a job because of my race' is all a complaint has to say." *Thomas v. JBS Green Bay, Inc.*, 120 F.4th 1335, 1337 (7th Cir. 2024) (quoting *Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998)). Given this forgiving standard, the Seventh Circuit has warned district courts not to dismiss Title VII claims under Rule 12(b)(6) merely because they "do not seem promising." *Id.* at 1338. "[T]he time to demand evidence is the summary-judgment stage. All the complaint need do is state a grievance. Details and proofs come later." *Id.*

"To state a Title VII hostile work environment claim, a plaintiff must allege (1) she was subject to unwelcome harassment; (2) the harassment was based on her national origin or religion (or another reason forbidden by Title VII); (3) the harassment was severe or pervasive so as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is basis for employer liability." *Huri v. Off. of the Chief Judge of the Cir. Ct. of Cook Cnty.*, 804 F.3d 826, 833–34 (7th Cir. 2015). "To plead a Title VII retaliation claim, a plaintiff must (though she need not use the specific terms) allege that she engaged in statutorily protected activity and was subjected to adverse employment action as a result of that activity." *Id.* at 833.

### 1. The Association and Chicagoland

Diallo has alleged sufficient facts to state plausible claims against the Association and Chicagoland under Title VII's discrimination, retaliation, and hostile work environment theories. First, the discrimination claim is supported by multiple adverse employment actions, including deprivations of compensation and benefits and his eventual termination. Moreover, the FAC includes facts supporting an inference that these actions were taken because of Diallo's race and national origin—namely, the allegations that (1) Diallo was repeatedly subject to overt

discrimination by Smith, Jenkins, and others, and yet the Association and Chicagoland declined to intervene, and (2) other doormen of different races and national origins were not deprived of workdays and benefits as he was. Accordingly, Diallo states a Title VII claim against Chicagoland and the Association for discrimination on the basis of his race or national origin.

Whether Diallo alleges a plausible hostile work environment claim is a closer question. The Association and Chicagoland are alleged to have created a hostile work environment by: (1) monitoring Diallo with cameras and audio equipment, (2) failing to remedy coworkers' overt discriminatory acts, and (3) systematically "subjecting Plaintiff to extreme temperatures ranging from 63°F to 85°F," thereby causing him significant health issues (FAC ¶ 316(a)). "These conditions were not imposed on coworkers of different races or national origins." (*Id.*)

To support a hostile work environment claim, a plaintiff's work conditions must have been "objectively and subjectively offensive," meaning that "a reasonable person would find [the environment] hostile or abusive, and . . . the victim in fact did perceive [it] to be so." *McPherson v. City of Waukegan*, 379 F.3d 430, 438 (7th Cir. 2004). In assessing a work environment, "[c]ourts should not carve up the incidents of harassment and then separately analyze each incident, by itself, to see if each rises to the level of being severe or pervasive." *Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1045 (7th Cir. 2000). Instead, the work environment must be evaluated based on the "totality of the circumstances." *Hall v. City of Chicago*, 713 F.3d 325, 331 (7th Cir. 2013).

Whether Diallo's work environment was objectively hostile is a question better decided upon a more complete factual record after discovery. At first glance, the conditions alleged— surveillance of a public lobby area, temperature fluctuations of 20 degrees, and isolated conflicts between co-workers—may not seem sufficiently severe to constitute a hostile work environment.

10

However, Diallo also alleges that the temperature fluctuations caused him to suffer physical harm and miss workdays, and that Defendants responded to his complaints by only intensifying their targeting. These allegations are sufficient to allege a plausible hostile work environment claim, even if narrowly. *See Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016) (explaining that important factors for the hostile work environment inquiry include "the frequency of improper conduct, its severity, whether it is physically threatening or humiliating (as opposed to a mere offensive utterance), and whether it unreasonably interferes with the employee's work performance"). At bottom, it would be "premature at the pleadings stage to conclude just how abusive [his] work environment was." *Huri*, 804 F.3d at 834. Accordingly, Diallo has stated a plausible hostile work environment claim against Chicagoland and the Association.

Finally, Diallo has also alleged a plausible retaliation claim against the Association and Chicagoland. First, he alleges that he undertook various forms of protected activity, including filing union grievances, raising complaints with management, and filing EEOC charges. Second, he alleges numerous adverse actions taken because of his protected activity, including increased surveillance, benefits denial, and ultimately, termination of his employment. *See Poullard v. McDonald*, 829 F.3d 844, 856 (7th Cir. 2016). Whether these actions were ***in fact*** caused by Diallo's protected activity is a question better left for a later stage. Moreover, Diallo may bring a retaliation claim based on his employer's actions in response to his filing of EEOC charges without filing an EEOC charge for retaliation. *See Tartol v. Discover Fin. Servs., Inc.*, No. 19 C 6907, 2020 WL 12188622, at *4 (N.D. Ill. July 1, 2020) (collecting cases showing that "a plaintiff need not exhaust administrative remedies for a retaliation claim where the facts giving rise to the alleged retaliation occur after filing an EEOC charge"). Accordingly, Diallo has stated a claim for retaliation against Chicagoland and the Association under Title VII.

### 2. Cerimovic and Davis

On the other hand, Diallo cannot allege plausible Title VII claims against Davis or Cerimovic. Title VII "impose[s] liability upon the complaining employee's 'employer.'" *Tamayo*, 526 F.3d at 1087 (quoting 42 U.S.C. § 2000e–2(a)). Davis and Cerimovic cannot be held liable in their individual capacities under Title VII because they were not his employers. Rather, they are alleged to be supervisors or co-workers who merely exercised their employer's authority. Because a "supervisor does not, in his individual capacity, fall within Title VII's definition of employer," Diallo "can state no set of facts which would enable [him] to recover" against Davis and Cerimovic under Title VII. *Williams v. Banning*, 72 F.3d 552, 555 (7th Cir. 1995); *Passananti v. Cook Cnty.*, 689 F.3d 655, 662 n.4 (7th Cir. 2012) ("Title VII authorizes suit **only** against the employer. Individual people who are agents of the employer cannot be sued as employers under Title VII."). Accordingly, they are not proper defendants under Title VII, and the Title VII claims against them are dismissed with prejudice. *See Owens v. WellCare Health Plans*, No. 17-1391-DRH, 2018 WL 3428767, at *2 (S.D. Ill. July 16, 2018).[2]

---

[2] Chicagoland argues that it, too, was not Diallo's employer. In making this argument, it contends Diallo's allegation that Chicagoland is "the former employer of the Plaintiff" is a legal conclusion that the Court should disregard. (FAC ¶ 6(b).) Besides this allegation, Chicagoland argues, the FAC "contains no factual allegations permitting a reasonable inference that an employment relationship existed between [Diallo] and Chicagoland." (Defs.' Mot. to Dismiss at 2, Dkt. No. 149.) To the contrary, however, Diallo's allegations suggest that Chicagoland played an important role in managing work schedules and employment decisions at 50 E Chestnut. At this stage, those allegations are sufficient to bolster his allegation that Chicagoland was his employer and prevent a finding to the contrary. *See Tamayo*, 526 F.3d at 1089 (concluding that the plaintiff's allegations that the defendant "controlled her salary" and "a number of other personnel decisions" were "more than sufficient to avoid dismissal of the [alleged employer] as a defendant at [the pleadings] stage"). That Chicagoland did not begin managing the building until April 2021 does not preclude this finding, because "multiple entities may be considered an employee's 'employer' for the purposes of Title VII liability." *Id.* at 1088.

3. *The Union*

Diallo also fails to state a plausible Title VII claim against the Union. Title VII does not establish union liability for an employer's discriminatory conduct. Instead, an employee may recover against his union under Title VII if it discriminates against him "when performing union functions, such as job referrals." *Johnson v. Int'l Longshoreman's Ass'n, Loc. 815 AFL-CIO*, 520 F. App'x 452, 453–54 (7th Cir. 2013) (citations omitted). Because "[t]he union is not the company, but the workers' agent in dealing with the company," a union violates Title VII if it "discriminates in the performance of its agency function," but not otherwise. *E.E.O.C. v. Pipefitters Ass'n Loc. Union 597*, 334 F.3d 656, 659 (7th Cir. 2003).

The Court previously dismissed Diallo's Title VII claims against the Union because his allegations "suggest[ed] that the Union failed to resolve his grievance," but did not "indicate how the Union responded to his claim or treated him differently because of his race throughout the grievance process." (12/6/2024 Order at 3–4, Dkt. No. 127.) Diallo's Title VII claims in the FAC share the same fate. Diallo alleges that the Union discriminated against him "by acting in bad faith, refusing to investigate or file his grievances, and aiding and abetting discriminatory practices by his employers and managers." (FAC ¶ 310.) However, he alleges no specific facts about how the Union aided and abetted his employers' discrimination practices, except for the fact that the Union denied his grievances after investigation. *See Johnson*, 520 F. App'x at 454 (affirming summary judgment of Title VII claim against a union where the union investigated the plaintiff-employee's report that a fellow union member called him a racial slur). Nor does he allege facts suggesting that the Union denied his claims because of his race or national origin. For example, Diallo alleges that on March 3, 2021, the Union settled one of his grievances "without Plaintiff's full knowledge or consent," thus depriving him of "six additional days of

13

owed compensation." (FAC ¶ 335(c).) But he alleges no facts connecting this deprivation to a discriminatory motive. A bare allegation of collusion was insufficient to support Diallo's discrimination claim against the Union in his first complaint, and it is insufficient in his FAC too. The Title VII claims against the Union are therefore dismissed with prejudice, because Diallo has already had one chance to cure the same pleading deficiencies that exist now.

In sum, Diallo's Title VII claims against the Association and Chicagoland for discrimination, retaliation, and hostile work environment survive Defendants' motions. However, his Title VII claims against the Union, Cerimovic, and Davis are dismissed with prejudice.

## II. Breach of Duty of Fair Representation and Violation of Collective Bargaining Agreement (Count IV)

In Count IV, Diallo brings claims against the Union for violating its collective bargaining agreement ("CBA") and breaching its duty to represent him fairly. In attempting to plead a CBA violation, Diallo alleges that the Union violated "specific terms of the Agreement," but he does not identify which terms he thinks the Union violated. (FAC ¶ 336.) The only CBA provision specified in the FAC is an "express[] prohibit[ion]" on "any union member from assuming a managerial position." (*Id.* ¶ 50.) Diallo appears to suggest that the Union violated the CBA by failing to prevent the Association from promoting Cerimovic to an interim manager position on January 7, 2021. (*Id.*) In substance, this allegation (like the rest of his allegations involving the Union) implicates a claim that the Union did not represent Diallo's interests fairly but does not indicate that the Union itself violated the CBA's terms. Because Diallo has not alleged any CBA violation on the Union's part, and Count IV is brought only against the Union (*see* 2/7/2025 Order), the Court focuses on his claim for a breach of the duty of fair representation. Broadly

speaking, Diallo alleges that the Union breached its duty to represent him fairly by failing to investigate and act on his claims of discrimination. (FAC ¶ 335.)

### A.     Background

With respect to this claim, Diallo alleges as follows.

From 2021 to 2022, Diallo filed three grievances related to discriminatory scheduling and benefits practices at 50 E Chestnut. These grievances were filed in January 2021 (*id.* ¶ 61), March 2021 (*id.* ¶¶ 79–81), and January 2022 (*id.* ¶ 122). The January 2021 grievance related to the refusal by Smith (then-head doorman) to schedule Diallo for certain shifts and favoring of less-senior employees of other national origins. Diallo sought reimbursement for the days he "was willing to work but was denied the opportunity." (*Id.* ¶ 61.) In response to Diallo's allegations, the Union's representatives held meetings with Diallo and building staff and collected information through conversations with Diallo and building staff.  (*Id.* ¶¶ 57–73.) Based on their investigations, two Union representatives—Chris Moore and Graciela Vergara— determined that Diallo's complaints lacked merit. (*Id.* ¶¶ 57, 73.) However, in declining to file Diallo's grievance, Vergara told Diallo that, among other things, "the union [could not] go against its members." (*Id.* ¶ 73.)

In March 2021, Diallo filed another grievance regarding discriminatory scheduling practices. In response, Vergara requested evidence from the building, and the Union's board independently reviewed his grievances. (*Id.* ¶¶ 79–87.) Diallo was granted a meeting with the board, at which he presented his grievances and "evidence of [the Union's] Grievance Department['s] negligence, facilitation of discrimination, and failure to provide fair representation." (*Id.* ¶ 87.) The Union's president directed the grievance department to resolve Diallo's grievances. (*Id.* ¶ 89.) The Union, the Association, and Chicagoland ultimately settled

15

Diallo's grievance for three days of pay, after what Vergara described as a "complete and careful review of all the issues surrounding [Diallo's] grievance." (*Id.* ¶¶ 96–98.) Despite his objection that he was owed compensation for an additional six days, Diallo agreed to the settlement. (*Id.* ¶ 97.)

Diallo's January 2022 grievance was based on Davis's allegedly discriminatory decisions toward Diallo—namely, that she had denied him $80 in benefit chargebacks for unused benefits, overcharged him $79 in union dues, and withheld about $147 from his "examination day benefits." (*Id.* ¶ 122.) A Union representative contacted Diallo regarding these actions. She "expressed skepticism about the validity of" his grievance and requested "all documents supporting his claims." (*Id.* ¶¶ 125–26.) Based on "an incorrect interpretation of the rule governing examination day pay," the representative determined Diallo was not entitled to the $147 in allegedly withheld benefits. (*Id.* ¶ 129.) She then "refused to file his grievance" because it "lacked merit," and directed Diallo to speak with her supervisor, Terry Townes, if he disagreed with her determination. (*Id.* ¶ 131–32.) After Diallo requested an appeal, Townes dismissed the grievance "for lack of merit." (*Id.* ¶ 138.) In the next several months, Diallo repeatedly appealed up the Union's chain of command. (*Id.* ¶¶ 139–62.) His efforts proved partially successful: in February 2022, the Association and Chicagoland agreed to pay him the $79 in union dues and $80 in benefit chargebacks. (*Id.* ¶ 151.) However, these payments were never in fact made. (*Id.*) Diallo continued to appeal the partial denial of his grievances. By October 2022, Diallo's appeal had reached the president of the Union's international body. After requesting "a statement and supporting evidence" from Diallo, the president's office reviewed the case and denied his appeal. (*Id.* ¶¶ 157–62.)

Diallo also alleges that the Union failed to investigate later grievances on four dates: June 14, 2023, July 6, 2023, July 10, 2023, and April 19, 2024. (*Id.* ¶ 335.) The 2023 events are all related. On June 14, Davis "emailed SEIU Union organizer Senad regarding the [temperature fluctuations], asking for a discussion about" these issues. (*Id.* ¶ 209.) Davis and Senad spoke over the phone and continued to discuss the matter over e-mail. (*Id.* ¶¶ 208–11.) On July 6, Davis forwarded Diallo's temperature-fluctuation complaints to Senad and wrote that they were "false allegations," based on her understanding that the "building heating and cooling system is designed to maintain temperatures within a 5-degree band from 72 degrees." (*Id.* ¶ 222.) On July 10, Diallo filed a grievance with the Union. (*Id.* ¶ 224.) "Union representative Ms. Benita Villarreal" received that grievance and "informed [Diallo] that she would only collect his statement and evidence to share with his manager." (*Id.*) "When [Diallo] questioned the process, Ms. Villarreal directed him to her supervisor and ended the call." (*Id.*) A few days later, Diallo e-mailed Villareal for "reassurance that she would investigate his complaint." (*Id.* ¶ 227.) The director of the Union's grievance department, "Mr. Bowen," responded that the Union's "role was not to investigate but to ensure the Employer fulfills its responsibility to provide a harassment-free work environment and investigate complaints." (*Id.* ¶ 228.) He also stated that the Union's investigation showed that the lobby temperature was automated, and, accordingly, "the matter was considered resolved." (*Id.*) Diallo continued pursuing his grievance, including by attempting to appeal Bowen's determination. (*Id.* ¶¶ 239–32.) That appeal was denied. (*Id.* ¶¶ 233–35.)

Finally, the allegations against the Union on April 19, 2024, involve a grievance Diallo filed after being fired. (*Id.* ¶ 288.) On April 23, Diallo spoke with Michelle Ramos, the representative assigned to this grievance, and disagreed with her about the proper course of

17

action. (*Id.* ¶ 293.) She stated she "would contact [Diallo's] employer and follow up, but she then abruptly ended the call." (*Id.*) Over the next several weeks, Ramos collected evidence in her investigation of Diallo's grievance and facilitated a meeting with Diallo and the building's representatives, during which Diallo presented "facts and evidence" showing "his termination was unjust." (*Id.* ¶¶ 294–97.) At this meeting, the Union representative "repeatedly interrupted him and disabled his video feed." (*Id.* ¶ 297.) About two weeks after the meeting, the Union informed Diallo that it "had determined his case lacked merit and would not proceed with filing the grievance, thereby closing the matter." (*Id.* ¶ 302.) Diallo appealed the determination and his appeal was denied. (*Id.* ¶¶ 303–05.)

### B.      Statute of Limitations

The Union argues that Diallo's breach of duty claim is entirely time-barred. There is a six-month statute of limitations for claims based on a breach of the duty of fair representation. *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 154–55 (1983). This limitations period "begins to run when the claimant discovered, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged breach of duty." *Holloway v. Shambaugh & Son, Inc.*, 988 F. Supp. 2d 901, 906 (N.D. Ind. 2013) (citing *Metz v. Tootsie Roll Industries, Inc.*, 715 F.2d 299, 304 (7th Cir. 1983)). Although "[c]ontinued correspondence with the union does not . . . toll the six-month time limit," it may be tolled "by the pursuit of internal union remedies even where those remedies are ultimately determined to have been futile." *Sosbe v. Delco Elecs. Div. of Gen. Motors Corp.*, 830 F.2d 83, 87 (7th Cir. 1987). Thus, in cases involving a union's failure to take action on a grievance, the limitations period begins to run when the union makes a final determination that it will not pursue the grievance. *See Metz*, 715 F.2d at 303–04.

18

Applying the six-month limitations period here, the Union contends that its actions before July 31, 2024—that is, six months before the FAC was filed—cannot form the basis of Diallo's breach of duty claims. In making this argument, the Union reasons that the FAC's fair-representation claims do not "relate back" to Diallo's discrimination claims against the Union in his first complaint—which was filed on September 21, 2023—for purposes of setting the statute of limitations. *See* Fed. R. Civ. P. Rule 15(c). Under Federal Rule of Civil Procedure 15(c)(1)(B), an amendment relates back to the original complaint if it "arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). Relation back depends on the amended claims' factual similarity with the original complaint. *See Coleman v. United States*, 79 F.4th 822, 829 (7th Cir. 2023). Diallo's original complaint asserted Title VII claims against the Union based on the same alleged conduct that now forms the basis of his breach of duty claim. Thus, the FAC relates back to the initial complaint, and September 21, 2023, is the relevant filing date for statute of limitations purposes.

The FAC's allegations make clear that any potential claims based on the grievances filed in 2021 and 2022 are time-barred. Even after drawing all reasonable inference in Diallo's favor, all of his 2021 and 2022 grievances resulted in final determinations by October 2022, when the Union's international president reviewed Diallo's complaints and denied any appeal. Any claim based on these grievances therefore needed to be filed by May 2023. However, Diallo did not file his initial complaint until September 2023, so his claims based on the 2021 and 2022 grievances are untimely. Meanwhile, Diallo's claim based on the July 2023 grievance accrued within the limitations period, and therefore may support a claim.

Finally, the FAC does not allege the date on which the April 2024 grievance was finally denied. Rather, it states only that Townes denied Diallo's appeal on May 21, 2024, and that the

Union's president denied Diallo's subsequent appeal on an unspecified date. (FAC ¶ 305.) In its motion to dismiss, the Union submits a letter from the Union's president denying the appeal on June 24, 2024. (*See* Def.'s Mot. to Dismiss at 7, Dkt. No. 148.) Thus, the Union argues that any claim based on the April 2024 grievance accrued by June 24, 2024 and would be untimely if filed after December 24, 2024. (*Id.*) Diallo did not file the FAC, in which he added claims related to his termination, until January 31, 2025—more than a month after the Union's proposed time bar. However, Diallo filed motions for leave to amend his initial complaint to add allegations related to his termination on May 24, 2024 and August 28, 2024 (Dkt. Nos. 61, 88). Those motions were granted on December 6, 2024 (Dkt. No. 127), when the Court dismissed Diallo's claims against the Union in the initial complaint. The statute of limitations may be tolled during the period that the motion for leave to amend was pending, *see Moore v. Indiana*, 999 F.2d 1125, 1131 (7th Cir. 1993) (explaining that statute of limitations may be tolled while a motion to amend complaint is pending), and the Union has provided no argument against such tolling here. Applying tolling during the pendency of the motions for leave to amend, Diallo's claims based on the April 2024 grievance are not time-barred.

The Court next considers whether Diallo states a plausible breach of duty claim against the Union. Although the Court has found some potential claims to be time-barred, the Court nevertheless considers the allegations from beyond the limitations period in its analysis, as such allegations could nonetheless be relevant to claims based on the Union's actions within the limitations period. Moreover, even setting the statute of limitations aside entirely, Diallo has failed to state a plausible breach of duty claim against the Union.

### C. Sufficiency of Allegations

The duty of fair representation "arises out of a union's role as the exclusive representative of all employees in a collective bargaining unit." *Taha v. Int'l Bhd. of Teamsters, Loc. 781*, 947 F.3d 464, 469 (7th Cir. 2020); *Sullers v. Int'l Union Elevator Constructors, Loc. 2*, 141 F.4th 890, 898 (7th Cir. 2025) (same). "Concomitant with the union's authority to act as its members' exclusive bargaining agent is its legal obligation to 'serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.'" *Sullers*, 141 F.4th at 898. Thus, "[a] union breaches its duty of fair representation if its actions are either (1) arbitrary, (2) discriminatory, or (3) made in bad faith." *Wickstrom v. Air Line Pilots Ass'n, Int'l*, 156 F.4th 835, 842 (7th Cir. 2025) (citing *Bishop v. Air Line Pilots Ass'n, Int'l*, 900 F.3d 388, 397 (7th Cir. 2018)). "A plaintiff is successful in pleading a breach of the duty of fair representation if he plausibly pleads a breach under **any** of the three prongs." *Bishop*, 900 F.3d at 397.

None of the FAC's allegations support a breach of duty claim against the Union. First, Diallo's allegations do not suggest that the Union acted arbitrarily. A union acts arbitrarily "only if . . . the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational." *Wickstrom*, 156 F.4th at 842. "Although a union may not arbitrarily ignore a meritorious grievance or process it in a perfunctory fashion, it has considerable discretion in handling grievances." *Id.* "That discretion recognizes that the union 'is not required to pursue all grievances through arbitration' and 'may consider all members' interests when deciding whether or not to press the claims of an individual employee.'" *Id.* "Accordingly, the union may 'act in consideration of such factors as the wise allocation of its own resources, its relationship with other employees, and its relationship with the employer.'" *Id.*

21

As noted above, Diallo focuses on the Union's judgments of whether and how to act on his grievances. Although a union may breach its duty of fair representation by ignoring a meritorious grievance, Diallo's conclusory allegations of the Union's "failure to investigate" are insufficient to state a claim on their own. Indeed, looking to the substance of Diallo's allegations, the Union took numerous investigative steps in response to all of his grievances—including gathering evidence from him and his employer, facilitating discussions with the employer and Diallo, and considering his appeals. Even the president of the Union's international division eventually reviewed Diallo's complaints. In some cases, these investigations led to favorable results for Diallo. Other times, he disagreed with the Union's dismissal of his grievances as lacking merit. However, Diallo's disagreement with the Union's procedures is not enough, on its own, to establish that it acted unreasonably. His allegations do not plausibly suggest that the Union arbitrarily handled his grievances.

Neither do Diallo's allegations suggest that the Union's actions were discriminatory. "[W]hether a union discriminated 'calls for a subjective inquiry and requires proof that the union acted (or failed to act) due to an improper motive.'" *Wickstrom*, 156 F.4th at 843 (quoting *Bishop*, 5 F.4th at 694). "[T]o rise to the level of a duty of fair representation breach, 'discriminatory conduct must be 'intentional, severe, and unrelated to legitimate union objectives.'" *Id.* at 843–44 (quoting *Bishop*, 5 F.4th at 694). "'[D]iscriminatory *impact*' is not in itself sufficient." *Id.* at 843. As discussed with respect to the Title VII claims, Diallo's only alleged indications of discriminatory intent are the Union's denials of his grievances. However, "[t]he mere fact that plaintiffs [are] a minority group within their union organization and that they were adversely affected by the actions of the union [does] not establish that the union acted with hostile or discriminatory intent." *Wickstrom*, 156 F.4th at 843. If anything, the allegations

22

reflect that the Union took Diallo's complaints seriously despite its consistent findings that they lacked merit. Setting any "conclusory assertions aside, none of the complaint's factual allegations permit the inference that," the Union denied Diallo's grievances "with the subjective intent to discriminate against" him. *Id.* at 844. Accordingly, he "fail[s] to plausibly allege discrimination." *Id.*

Finally, Diallo does not allege facts suggesting that the Union acted in bad faith. "As with claims of discrimination, claims of bad faith call for a 'subjective inquiry' and require that the union had 'an improper motive.'" *Id.* at 844. A Union has an improper motive where, for example, it acts "***solely*** for the benefit of a stronger, more politically favored group over a minority group." *Id.* As was the case with his discrimination claims, Diallo does not allege facts suggesting that the Union impermissibly subverted his interests to other employees' or otherwise had an improper motive.

The closest Diallo comes to alleging that the Union denied his grievances in bad faith is his allegation that Vergara told him "the union can't go against its members" when she denied his January 2021 grievance. (FAC ¶ 73.) However, this statement came after both Moore and Vergara had already investigated and dismissed the allegations underlying the grievance. And similar allegations of unfair scheduling practices would form the basis of later grievances that were reviewed and denied by other Union employees. Given these facts, Vergara's statement is insufficient to suggest that the Union in fact denied Diallo's grievances merely because it could not oppose its members. *See Sullers*, 141 F.4th at 901 (affirming summary judgment for union where a union official "scream[ed] at [the plaintiff] to drop his . . . claim," because "evidence of one official's conduct does not support a finding that the Union was improperly motivated in its handling of [the plaintiff's] grievance").

Accordingly, Diallo fails to state a claim for breach of the duty of fair representation. *See Wickstrom*, 156 F.4th at 842–44 (holding that fair-representation claim could not overcome Rule 12(b)(6) without allegations supporting an inference of discrimination, bad faith, or arbitrariness); *Taha v. Int'l Bhd. of Teamsters, Loc. 781*, 947 F.3d 464, 468, 471 (7th Cir. 2020) (affirming Rule 12(b)(6) dismissal of a breach of duty claim where the plaintiff's union told him "to remain silent" during a grievance hearing and "prevented [him] from presenting several strong and important exhibits" because, among other reasons, the plaintiff failed to provide "any basis to infer the union acted irrationally or outside the bounds of its discretion").

### III.     Claims under State Law and the Electronic Communications Privacy Act

In Counts V through VIII, Diallo raises numerous claims under Illinois law, as well as a claim for violations of the federal Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2510 *et seq*. Because the ECPA claim is substantially similar to several of Diallo's state-law claims, the Court discusses it along with those claims.

### A.     Negligence (Count V)

In Count V, Diallo asserts negligence claims based on several of Defendants' alleged acts, including that: (1) the Association hired Cerimovic "without proper vetting, despite his lack of qualifications"; (2) the Union "failed to take corrective action" in response to the Association's breach of its employment agreement with Diallo; (3) all Defendants "permitted unsafe conditions" like the lobby temperature fluctuations and surveillance; (4) Chicagoland "breached [its] managerial duties" by failing to address the hostile work environment and delegating managerial responsibilities improperly; and (5) Cerimovic "breached his duty of care" by creating unsafe lobby conditions. (FAC ¶ 341.)

Diallo cannot pursue negligence claims against the Association or Chicagoland based on his allegations. The Illinois Workers Compensation Act ("IWCA") "abrogates employer liability for all common law negligence claims." *Doe v. La Magdalena II, Inc.*, 585 F. Supp. 2d 984, 986 (N.D. Ill. 2008). To the extent Diallo seeks to hold the Association or Chicagoland liable for Cerimovic's or Davis's actions, the IWCA prevents him from doing so under a common law cause of action. *See Meerbrey v. Marshall Field & Co.*, 564 N.E.2d 1222, 1226 (Ill. 1990) ("Because injuries intentionally inflicted by a co-worker are accidental from the employer's point of view, the employer has a right to consider that the injured employee's sole remedy against the employer will be under the [IWCA].").

To be sure, a plaintiff's negligence claim against his employer can avoid IWCA preemption if the alleged "injury '(1) was not accidental, (2) did not arise from . . . her employment, (3) was not received during the course of employment or (4) was noncompensable under the Act.'" *Doe*, 585 F. Supp. 2d at 986 (quoting *Collier v. Wagner Castings Co.,* 408 N.E.2d 198, 202 (Ill. 1980)). But none of these conditions apply here. The exception that comes the closest perhaps is that for non-accidental injuries—as Diallo alleges that his co-employees acted intentionally rather than accidentally. However, "injuries inflicted intentionally upon an employee by a co-employee are 'accidental' within the meaning of the Act" because "such injuries are unexpected and unforeseeable from the injured employee's point of view." *Meerbrey*, 564 N.E.2d at 1226. There is no allegation that the Association or Chicagoland "commanded or expressly authorized" Diallo's co-employees to harm him. *Id.*; *see also Lannom v. Kosco*, 634 N.E.2d 1097, 1100–01 (Ill. 1994) ("An injury is 'accidental' within the meaning of the [IWCA] when it occurs unexpectedly and without affirmative act or design ***by the employee***."). Thus, any negligence claim against the Association or Chicagoland is preempted by

25

the IWCA. *Baylay v. Etihad Airways P.J.S.C.*, 881 F.3d 1032, 1038 (7th Cir. 2018) (explaining that common law claims preempted by the IWCA may only proceed through the act's "administrative remedy").

Additionally, any negligence claims based on the Association's and Chicagoland's failures to manage Diallo's employment conditions properly are not actionable under a negligence theory because they are preempted by the Illinois Human Rights Act ("IHRA"). The IHRA preempts tort claims that are "inextricably linked with a civil rights violation." *Maksimovic v. Tsogalis*, 687 N.E.2d 21, 24 (Ill. 1997). Under this standard, a claim is preempted where "the IHRA furnishes the legal duty that the defendant was alleged to have breached." *Bannon v. Univ. of Chicago*, 503 F.3d 623, 630 (7th Cir. 2007) (internal alteration and quotation marks omitted). "If the plaintiff's allegations against the defendant implicate only a duty provided by the IHRA, such as the duty of employers to refrain from discriminating against employees on the basis of their race or national origin, then the plaintiff's claim is preempted." *Id.* Here, the Association and Chicagoland are alleged to have committed negligence by intentionally refusing to prevent discriminatory conduct by Diallo's co-workers. A negligence claim based on such allegations is inextricably linked with his employment discrimination claims and therefore falls squarely within the IHRA's reach.

Diallo's negligence claim against the Union is preempted by the Union's federal duty of fair representation. "As with state law claims implicating § 301 of the LMRA, an employee's state law claims against his union, challenging the union's alleged deficient representation of him in disputes with his employer, are displaced by the federal law of the duty of fair representation." *Brumbaugh v. Int'l Bhd. of Elec. Workers, Loc. Union No. 51*, No. 06-3302, 2007 WL 2683994, at *3 (C.D. Ill. Aug. 2, 2007) (collecting cases); *Sullers v. Int'l Union of Elevator Constructors*

26

*Loc. 2*, No. 20 C 7696, 2022 WL 21303304, at *2 (N.D. Ill. Feb. 16, 2022) (same). Here, Diallo's negligence claims revolve around allegations that the Union failed to respond to his grievances reasonably. Those claims fall squarely within the ambit of the duty of fair representation, and are therefore preempted. And as discussed above, Diallo fails to state a claim for a breach of that duty.

Finally, Diallo's negligence claims against Davis and Cerimovic are also preempted by the IWCA. Although "Illinois law permits employees to pursue claims for intentional torts committed by co-workers," the IWCA "bars an injured employee from bringing a negligence suit against a co-worker for workplace injuries." *Flores v. Nissen*, 213 F. Supp. 2d 871, 874 (N.D. Ill. 2002) (citing *Ramsey v. Morrison*, 676 N.E.2d 1304, 1307–09 (1997)). To the extent Diallo seeks to recover against Davis and Cerimovic—*i.e.*, his co-workers—under a negligence theory, the IWCA prevents him from doing so.

Thus, the Court concludes that all of Diallo's negligence claims are preempted by state and federal statutes. His negligence claims are dismissed with prejudice.

### B.      Assault (Count VI)

In Count VI, Diallo alleges that Defendants' various alleged acts of discrimination constituted assault. In Illinois, assault is "defined as an intentional, unlawful offer of corporal injury by force, or force unlawfully directed, under such circumstances as to create a well-founded fear of imminent peril, coupled with the apparent present ability to effectuate the attempt if not prevented." *Parrish by Bowker v. Donahue*, 443 N.E.2d 786, 788 (Ill. App. Ct. 1982). In other words, an assault occurs where there was "(1) a threatening ***gesture***, or an otherwise innocent gesture made threatening by the accompanying words, that (2) creates a

reasonable apprehension of an ***imminent*** battery." *Kijonka v. Seitzinger*, 363 F.3d 645, 647 (7th Cir. 2004) (emphasis in original).

Diallo fails to state a claim for assault. To begin, Defendants' surveillance of the lobby and manipulation of its temperature cannot form the basis of an assault claim because that conduct does not involve a gesture, verbal communication, or any other "offer of corporal injury by force." *Donahue*, 443 N.E.2d at 788. That said, Diallo alleges two actions that involve something like an "offer of corporal injury." First, he alleges that Smith "ran toward [him] aggressively and stood inches from his face." (FAC ¶ 347.) Second, he alleges that another co-worker, referred to as "Jenkins," threw seat cushions at him on multiple occasions. (*Id.*) Even assuming these actions rise to the level of assault under Illinois law, neither Jenkins nor Smith is a party to this suit, and none of Defendants can be held liable for their intentional torts because Diallo does not allege that they acted in furtherance of their employer's interests. *See Rice v. Nova Biomedical Corp.,* 38 F.3d 909, 913 (7th Cir. 1994) ("Intentional torts do not fall within the scope of the doctrine of *respondeat superior* unless the employee or agent is acting in furtherance (however misguidedly) of his principal's business."). The FAC also lacks any facts establishing that the Union or its agents threatened Diallo with force. Accordingly, Diallo fails to state a claim for assault against any Defendants.

### C.     Tortious Interference with Employment (Count VII)

In Count VII, Diallo alleges that Defendants tortiously interfered with his employment. Under Illinois law, the elements of a claim of tortious interference with employment expectancy are essentially the same as for tortious interference with business expectancy or economic advantage. *Ricco v. Sw. Surgery Ctr., LLC*, 73 F. Supp. 3d 961, 973 (N.D. Ill. 2014). Those elements are: "(1) [the] plaintiff's reasonable expectation of entering into a valid employment

relationship, (2) [the] defendant's knowledge of the plaintiff's expectancy, (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid employment relationship, (4) damages to the plaintiff resulting from such interference." *Id.* (quoting *Botvinick v. Rush Univ. Med. Ctr.*, 574 F.3d 414, 417 (7th Cir. 2009)). Claims for tortious interference with employment usually "lie against third-parties who cause the employer/employee relationship to terminate and not against the employer or agent who terminates the employee." *Otterbacher v. Nw. Univ.*, 838 F. Supp. 1256, 1260–61 (N.D. Ill. 1993) (holding that allegations that plaintiff's supervisor gave unrealistic and unreasonable demands on the job did not state a claim for tortious interference with employment). Thus, a supervisor may only be held liable for tortious interference with employment if a third-party was the final decision-maker, this third-party relied on false information provided by the supervisor, and the supervisor acted "solely for his or her personal interest, and totally unrelated to or antagonistic to the interest of the employer, in order to effectuate a wrongful termination of a subordinate." *Id.* at 1261.

Diallo has failed to state a claim against the Union, the Association, and Chicagoland. He cannot make out a claim against the Association or Chicagoland because he alleges that they were his employers, and therefore they cannot have tortiously interfered with their own relationship with him. *See Mustafa v. Ill. Dep't of Pub. Aid*, No. 96 C 5177, 1997 WL 194980, at *5 (N.D. Ill. Mar. 14, 1997) ("[A] claim for intentional interference . . . typically is inapplicable to the employer or agent who actually terminates the employee.").

Meanwhile, Diallo has not alleged any facts supporting a tortious interference claim against the Union. The Court can find no allegation in the FAC that supports an inference that the Union purposefully interfered with his expectation of continued employment. Under the

29

heading of Count VII, Diallo alleges that, on "May 18, 2021," the Union and Davis "unjustly settled [his] grievance for fewer days than owed and refused transparency in the settlement process." (FAC ¶ 355(e).) However, this allegation has nothing to do with Diallo's expectation of continued employment. Moreover, a tortious interference claim based on the Union's denial of his grievances would be preempted by his breach of fair representation claim. *See, e.g.*, *Sullers*, 2022 WL 21303304, at *2–3 (dismissing state-law claims as preempted where they relied on allegations that the union "conspire[ed], aid[ed] and abet[ed] [the employer's] racial discrimination, as well retaliate[ed] against [the plaintiff]," since all those claims "invoke[d] the [the union's] duty to fairly represent him in the process of filing a grievance against his employer").

Cerimovic and Davis argue for dismissal of the tortious interference claims against them because "apart from conclusory pleading that the Court should disregard, [Diallo's] allegations fail to show that any of the defendants induced the Association to breach Plaintiff's employment contract." (Defs.' Mot. to Dismiss at 12.) But, on the contrary, Diallo has set forth sufficient facts to state a tortious interference claim. Specifically, he alleges that, on numerous occasions, Cerimovic and Davis made false statements to the Association that reflected poorly on his work performance and ultimately led to his termination. These allegations are sufficient to state a claim. In reaching this conclusion, the Court notes that Cerimovic and Davis have not argued at the pleadings stage for the protection of any privilege arising out of their employment positions. Such privileges can provide immunity for claims against defendants arising from their role as "[c]orporate officers, supervisors [or] co-workers." *Naeemullah v. Citicorp Servs., Inc.*, 78 F. Supp. 2d 783, 793 (N.D. Ill. 1999). Those groups of employees—even if they had "a hand in terminating the employee—'are privileged to act on behalf of the corporation, using their

30

business judgment and discretion.'" *Naeemullah v. Citicorp Servs., Inc.*, 78 F. Supp. 2d 783, 793 (N.D. Ill. 1999). However, agents who act in their own personal interests or out of malice do not receive the privilege's protection. *Delloma v. Consol. Coal Co.*, 996 F.2d 168, 172 (7th Cir. 1993). In any case, whether Cerimovic and Davis in fact acted out of personal interest is a question better decided upon a fuller record. *See, e.g.*, *Ricco v. Sw. Surgery Ctr., LLC*, 73 F. Supp. 3d 961, 974 (N.D. Ill. 2014) ("Whether [the defendant] was pursuing a legitimate interest of the company or whether his actions were malicious and without justification is a question for the jury."). For now, the tortious interference claims against Davis and Cerimovic survive dismissal.

**D.      Intentional Infliction of Emotional Distress (Count VIII)**

In Count VIII, Diallo alleges that Defendants' conduct constituted intentional infliction of emotional distress ("IIED"). Under Illinois law, an IIED claim has three elements: "(1) the defendant's conduct was extreme and outrageous; (2) the defendant intended to inflict severe emotional distress or knew that there was at least a high probability that her conduct would inflict severe emotional distress; and (3) the defendant's conduct did cause severe emotional distress." *Khanna v. Banks*, No. 21 C 5752, 2024 WL 3338938, at *10 (N.D. Ill. July 9, 2024) (citing *Sun v. Xu*, 99 F.4th 1007, 1013 (7th Cir. 2024)). To "qualify as outrageous, the nature of the defendant's conduct must be so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized society." *Richards v. U.S. Steel*, 869 F.3d 557, 566 (7th Cir. 2017) (quoting *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 83 (Ill. 2003)). Courts apply an objective standard to determine whether conduct is extreme and outrageous and may dismiss an IIED claim if the alleged conduct is not sufficiently so. *See Cook v. Winfrey*, 141 F.3d 322, 332 (7th Cir. 1998).

31

Illinois courts "often hesitate to find a claim for [IIED] in employment situations" based on the concern that "if everyday job stresses resulting from discipline, personality conflicts, job transfers, or even terminations could give rise to a cause of action for [IIED], nearly every employee would have a cause of action." *Graham v. Commonwealth Edison Co.*, 742 N.E.2d 858, 867 (Ill. App. Ct. 2000). Accordingly, "in the absence of conduct calculated to coerce an employee to do something illegal, courts have generally declined to find an employer's retaliatory conduct sufficiently extreme and outrageous as to give rise to an action for intentional infliction of emotional distress." *Welsh v. Commonwealth Edison Co.*, 713 N.E.2d 679, 684 (Ill. App. Ct. 1999).

Here, none of Defendants' alleged conduct is sufficiently extreme to form the basis of an IIED claim in the workplace context. *See, e.g., Harriston v. Chi. Tribune Co.*, 992 F.2d 697, 703 (7th Cir. 1993) (affirming dismissal of IIED claim where plaintiff alleged she was reprimanded without cause, forced out of a management position, falsely accused of having poor sales, and threatened with discipline); *Shamim v. Siemens Indus., Inc.*, 854 F. Supp. 2d 496, 512–13 (N.D. Ill. 2012) (dismissing IIED claim based on defendant-supervisor subjecting plaintiff to "outbursts of yelling, profanity, and insults about his religion and ethnicity" and making false comments about plaintiff to others). Accordingly, Diallo fails to state a plausible IIED claim.

### E. Fraud/Misrepresentation (Count IX)

In Count IX, Diallo alleges that several of Defendants' actions constituted fraud. "The elements of common law fraud are: (1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages

resulting from reliance on the statement." *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 591 (1996).

Most of Diallo's fraud allegations are based on communications made to persons other than Diallo, and therefore the communications were not intended to induce any action on his part nor did he act in reliance on those communications. For example, Diallo alleges that Davis and Cerimovic misrepresented the quantity of vacation days and benefits to which he was entitled. In one of those occurrences, Cerimovic told the Union that Diallo was entitled to four vacation days, rather than six. (FAC ¶¶ 367(a)–(d).) On another occasion, the Association, Chicagoland, and Davis "falsely settled" a "grievance by stating Plaintiff was entitled to only three days, despite clear evidence that he was owed an additional six days." (FAC ¶ 367(e).) Diallo's employers' and supervisors' communications with the Union to settle grievances cannot plausibly have involved statements made with an intent to induce *Diallo* to act. Nor does Diallo allege any actions he actually took in reliance upon those statements. Moreover, Diallo fails to allege detrimental reliance because he disputed many of the allegedly false representations at the time they were made. Thus, Diallo's "own allegations make clear that [he] did not rely upon" Defendants' false statements "as true." *Raquet v. Allstate Corp.*, 348 F. Supp. 3d 775, 785 (N.D. Ill. 2018). After setting aside allegations exhibiting these flaws, no allegations are left to support Diallo's fraud claims.

### F. Electronic Communications Privacy Act (Count X), Invasion of Privacy (Count XII), and Illinois Eavesdropping Act (Count XIII)

In Counts X, XII, and XIII, Diallo asserts claims for violation of the ECPA, common-law invasion of privacy, and a violation of the Illinois Eavesdropping Act. Pursuant to the ECPA's private right of action, a person whose "oral . . . communication is intercepted, disclosed or intentionally used in violation of [the ECPA]" may bring a civil action against "the person or

33

entity . . . which engaged in that violation." 18 U.S.C. § 2520(a). The ECPA defines "oral communication" as "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation." 18 U.S.C. § 2510(2). In other words, claims arising under the ECPA "are predicated on enjoying a reasonable expectation of privacy in [the allegedly intercepted] oral communications." *Kee v. City of Rowlett*, 247 F.3d 206, 212 (5th Cir. 2001). Similarly, "[t]o bring a claim under the Illinois Eavesdropping Act, . . . at least one participant in the conversation must have held a reasonable expectation of privacy." *See Evans v. Civitas Educ. Partners, LLC*, No. 22 C 3842, 2024 WL 4449988, at *4 (N.D. Ill. Oct. 9, 2024).

Diallo bases his ECPA and Illinois Eavesdropping Act claims on the allegation that Defendants used security cameras "to monitor Plaintiff and capture all sounds, including conversations and background noise, during his work shifts." (FAC ¶ 374). Diallo worked in the lobby of a condominium building. To the extent he had conversations in that lobby, they were not protected by a reasonable expectation of privacy. *See Acosta v. Scott Lab. LLC*, 377 F. Supp. 2d 647, 651 (N.D. Ill. 2005) (explaining that courts have generally held that "employees do not have a reasonable expectation of privacy in an open and undifferentiated work area"). This is especially true given that Diallo was aware of the presence of surveillance technology. *Evans v. Amazon.com, Inc.*, 759 F. Supp. 3d 891, 898–99 (E.D. Wis. 2024) (finding that presence of **hidden** surveillance cameras in a delivery van did not violate the driver's privacy expectations because his "actions inside the van were, at least to some extent, openly visible as if in an open office setting, and therefore not subject to a reasonable expectation of privacy"). Diallo therefore cannot state a plausible claim for interception of his communications under the ECPA or the Illinois Eavesdropping Act. *See Acosta*, 377 F. Supp. 2d at 651 (finding that a firm's principal

failed to allege a reasonable expectation of privacy implicated by subordinate employee's recording of him at work and submission of the recordings to a local news channel for airing in a segment concerning employment practices).

In Illinois, "[t]here are four invasion of privacy torts: (1) intrusion upon seclusion of another; (2) appropriation of a name or likeness of another; (3) publication given to private life; and (4) publicity placing another person in false light." *Duncan v. Peterson*, 835 N.E.2d 411, 422 (Ill. App. Ct. 2005). Diallo expressly invokes the theory of intrusion upon seclusion in his complaint. (FAC ¶ 388.) An intrusion upon seclusion claim has four elements: "(1) the defendant committed an unauthorized intrusion or prying into the plaintiff's seclusion; (2) the intrusion would be highly offensive or objectionable to a reasonable person; (3) the matter intruded on was private; and (4) the intrusion caused the plaintiff anguish and suffering." *Busse v. Motorola, Inc.*, 813 N.E.2d 1013, 1017 (Ill. App. Ct. 2004).

Diallo alleges that Defendants intruded upon his seclusion by sharing details from his personnel file among themselves and with the Union during the grievance process. However, it cannot plausibly be suggested that Diallo's personnel file—which was in his employers' and supervisors' control—was a "private" matter. Moreover, Defendants accessed his work files in their proper capacity as his employer—or, in the case of the Cerimovic and Davis, as agents of his employer. *See, e.g.*, *Socha v. City of Joliet, Illinois*, 107 F.4th 700, 711 (7th Cir. 2024) (explaining that "employer-employee" relationship can "provide authorization" for intrusion); *see also Acosta*, 377 F. Supp. 2d at 651 ("Courts have consistently held that videotaping a work area or office in an attempt to monitor workplace conduct is not a violation of privacy."). Thus, Diallo fails to allege a claim for intrusion upon seclusion.

35

### G.      Breach of Confidentiality (Count XI)

In Count XI, Diallo alleges that Defendants breached a duty of confidentiality owed to him by "disclos[ing] personal work information." (FAC ¶ 381.) The information disclosed included Defendants' internal communications regarding his work records and files. (*Id.* ¶ 383.) Specifically, the disclosures occurred when: (1) on March 15, 2021, Cerimovic shared Diallo's employment file with the Union. (*Id.* ¶ 383(a)); (2) on December 16, 2023, Chicagoland and Davis shared Diallo's employment file with a member of the Association's board (*Id.* ¶ 383(b)); (3) over several months in 2021, the Association allowed Cerimovic, who was then serving as Diallo's supervisor, to access Diallo's "work information" (*Id.* ¶ 383(c)).

As Defendants point out, Illinois law does not include a common law tort for breach of confidentiality. *Dinerstein v. Google, LLC*, 484 F. Supp. 3d 561, 595 (N.D. Ill. 2020), *aff'd as modified*, 73 F.4th 502 (7th Cir. 2023) ("[I]t is unlikely that Illinois would recognize the breach of confidentiality tort.").[3] Moreover, the Court identifies no other cause of action under Illinois law that would provide Diallo with a claim arising out of Defendants' sharing of his work file internally or pursuant to the grievance process. *See Mucklow v. John Marshall L. Sch.*, 531 N.E.2d 941, 945–46 (Ill. App. Ct. 1988) (finding that "neither" "Illinois common law [nor]

---

[3] Diallo argues that the case "*Cairel v. Alderden*, 821 F. Supp. 2d 888 (N.D. Ill. 2011)" stands for the proposition that "breach of confidentiality can be a valid tort claim under Illinois law when someone discloses private information they had a duty to keep confidential." (Pl.'s Resp. at 6, Dkt. No. 154.) However, the case at 821 F. Supp. 2d 888 is *Brantley v. Inspectorate Am. Corp.*, 821 F. Supp. 2d 879 (S.D. Tex. 2011), which has nothing to do with Illinois law or a breach of confidentiality. Although a case captioned *Cairel v. Alderden* exists in this District, its true citations are 2010 WL 672103 (N.D. Ill. Feb. 19, 2010) and 2014 WL 916364 (N.D. Ill. Mar. 6, 2014), *aff'd*, 821 F.3d 823 (7th Cir. 2016). That case did not concern a breach of confidentiality either. Accordingly, it appears that Diallo's citation to *Cairel v. Alderden* may have been fabricated, perhaps with the use of generative artificial intelligence ("AI") applications. Diallo is reminded that, while the use of AI is not prohibited by this Court's local rules, "all litigants—represented and unrepresented—must read their filings and take reasonable care to avoid misrepresentations, factual and legal." *Jones v. Kankakee Cnty. Sheriff's Dep't*, 164 F.4th 967, 970 (7th Cir. 2026). Failure to do so may result in sanctionable violations of Federal Rule of Civil Procedure 11.

36

statutory law . . . allows a cause of action for breach of confidence" based on the plaintiff's claim that his professor "wrongfully intercepted the student teacher evaluation written by [the] plaintiff, in which [the] plaintiff made detailed critical comments about [the professor]"). Diallo therefore fails to state a plausible claim based on these allegations.

### H.     Defamation (Count XIV)

In Count XIV, Diallo alleges that Davis and Cerimovic defamed him by making certain performance reviews. In Illinois, a defamation claim requires "facts showing that the defendant made a false statement about the plaintiff, that the defendant made an unprivileged publication of that statement to a third party, and that this publication caused damages." *Green v. Rogers*, 917 N.E.2d 450, 459 (Ill. 2009). "An Illinois defamation action may state a claim either for defamation *per se* (statements so harmful to reputation that damages are presumed) or defamation *per quod* (statements requiring extrinsic facts to show their defamatory meaning)." *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 924 (7th Cir. 2003). Five categories of statements can be defamatory *per se* in Illinois, including "words that impute a person is unable to perform or lacks integrity in performing her or his employment duties" and "words that impute a person lacks ability or otherwise prejudices that person in her or his profession." *Green*, 917 N.E. 2d at 459. "Illinois imposes a one-year statute of limitations on all defamation actions that begins to run when the defamatory statement was published." *Muzikowski*, 322 F.3d at 923.

Diallo alleges that Davis and Cerimovic made various false statements about him "with the intent to damage [his] professional reputation, undermine his employment, and cause financial and emotional harm." (FAC ¶ 399.) These claims were not brought in his initial complaint. Because Cerimovic and Davis were not parties to the initial complaint and their conduct giving rise to the defamation claims was not alleged in the initial complaint, Diallo's

37

defamation claims do not "relate back" to that document. *See* Fed. R. Civ. P. 15(c)(1)(C); *Dochee v. Methodist Hosps., Inc.*, No. 2:21-CV-275-JEM, 2024 WL 4345774, at \*4 (N.D. Ind. Sept. 30, 2024) (finding defamation claim against individual co-worker did not relate back to initial complaint alleging discrimination against employer). Accordingly, any defamation claim based on statements published before January 31, 2024—one year before the FAC's filing—is time-barred. That leaves only two statements. First, on March 6, 2024, Cerimovic told Davis falsely that Diallo had been absent from work (FAC ¶ 399(k)) (the "March Statement")[4]; (2) on April 17, 2024, Davis and Cerimovic "reviewed Plaintiff's shift video footage and falsely accused him of leaving the premises for 32 hours and 57 minutes between April 5, 2024, and April 17, 2024, as a pretext to terminate his employment" (*Id.* ¶ 399(s)) (the "April Statement").[5] Notably, Diallo alleges that his employment was terminated on April 18, 2024 by "Ms. Pollock," the president of the Association's management board, "under the pretext of him leaving his desk." (*Id.* ¶ 33–34.)

The March Statement is insufficient to support a defamation claim because Diallo alleges no facts regarding its context or the harm it caused. Indeed, Diallo expressly alleges that his later termination was based on Davis and Cerimovic's statements to Pollock regarding his alleged absence in April, not Cerimovic's statement to Davis in March. Even after drawing all plausible inferences in Diallo's favor, the Court finds that he fails to allege that the March Statement

---

[4] The full allegation is that Cerimovic "falsely accus[ed] Plaintiff of not coming to work and further stating that due to Plaintiff's accusations, he was taking clonazepam, implying instability." (FAC ¶ 399(k).) The second half of the allegation—Cerimovic's statement that "he was taking clonazepam, implying instability" —is not a statement about Diallo.

[5] In a sense, Diallo's allegation that Davis and Cerimovic made a false statement that led to his termination contradicts his claims that his termination was based on his race and national origin. However, although these theories may be somewhat inconsistent, there is "no rule against inconsistent pleadings in . . . a single suit." *Peterson v. McGladrey & Pullen, LLP*, 676 F.3d 594, 597 (7th Cir. 2012).

caused harm to his reputation. And this statement cannot form the basis of a defamation *per se* claim, because the statement that Diallo was absent from his desk on a single occasion is not so offensive that it imputes his integrity or broader ability to perform. *See Nelson v. Bd. of Educ., Country Club Hills Sch. Dist. 160*, 292 F. Supp. 3d 792, 800 (N.D. Ill. 2017) (at summary judgment stage, finding a statement that the plaintiff "had abandoned her position . . . for the academic year" did "not suggest that [the plaintiff] is ***unable*** to perform her job or ***lacks integrity*** in performing her job"). Thus, Diallo fails to state a defamation claim based on the March Statement. *See Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 468 (7th Cir. 2014) (affirming summary judgment on defamation claim against a former co-worker who stated that plaintiff "made a change that screwed things up for the company," because that statement "says nothing about his ability to perform in his position in general—only that he had made a particular error at [the company]").

Defendants argue that April Statement is "defective for failure to provide any context for the publication." (Defs.' Mot. to Dismiss at 15, Dkt. No. 149.) However, reading the March Statement alongside Pollock's decision to terminate Diallo, it can be reasonably inferred at this stage that Davis and Cerimovic's false statement regarding Diallo's persistent absence from his desk was made to Pollock, who then made the decision to terminate Diallo's employment. At a later stage (for instance, summary judgment or trial), Diallo will be burdened with producing evidence sufficient to prove these facts. For now, however, he has alleged facts sufficient to provide Davis and Cerimovic with fair notice of a defamation claim based on the April Statement. *See Muzikowski*, 322 F.3d at 926 (explaining that defamation claims in federal court are held to "the usual rules for notice pleading established by Rule 8"); *Rivera v. Allstate Ins.*

*Co.*, 140 F. Supp. 3d 722, 728 (N.D. Ill. 2015) (collecting cases showing that "Rule 8 does not require that the complaint recite verbatim the allegedly defamatory statement").

Diallo has stated a plausible defamation claim against Cerimovic and Davis based only on the April Statement.

**CONCLUSION**

For the reasons stated above, Defendant Service Employees International Union Local 1's motion to dismiss the First Amended Complaint (Dkt. No. 147) is granted. All claims against the Union are dismissed. The motion to dismiss filed by Defendants 50 East Chestnut Condo Association, Mirsad Cerimovic, Chicagoland Community Management Inc, and Rebecca Davis (Dkt. No. 149) is granted in part and denied in part. Diallo's Title VII claims (Counts I, II, and III) are dismissed, with prejudice, as to all Defendants except the Association and Chicagoland. All of Diallo's remaining claims are dismissed, with two exceptions. First, Diallo has stated a claim for tortious interference with an employment expectancy against Defendants Davis and Cerimovic (Count VII). Second, Diallo has stated a defamation claim against Defendants Davis and Cerimovic (Count XIV). To summarize, the surviving claims are: (1) the Title VII claims against the Association and Chicagoland (Counts I, II, III); (2) the tortious interference claim against Davis and Cerimovic (Count VII); and (3) the defamation claim against Davis and Cerimovic (Count XIV).

ENTERED:

_____
Dated: April 9, 2026

Andrea R. Wood
United States District Judge

40